Case 8:19-cr-00593-TDC   Document 39   Filed 10/22/20   Page 1 of 14



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

| | | | |
|---|---|---|---|
| *Harry M. Gruber*<br>*Assistant United States Attorney*<br>*Harry.Gruber@usdoj.gov* | *Mailing Address:*<br>*36 S. Charles Street, 4th Floor*<br>*Baltimore, MD 21201* | *Office Location:*<br>*36 S. Charles Street, 4th Floor*<br>*Baltimore, MD 21201* | *DIRECT: 410-209-4835*<br>*MAIN: 410-209-4800*<br>*FAX: 410-962-3910* |

September 4, 2020

Elizabeth Oyer
Assistant Federal Public Defender
Office of the Federal Public Defender for the District of Maryland
100 S. Charles Street, 9th Floor, Tower II
Baltimore, MD  21201

\_\_\_\_ FILED   \_\_\_ ENTERED
\_\_\_\_ LOGGED  \_\_\_\_\_ RECEIVED

1:26 pm, Oct 22 2020
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY \_\_\_dds_____Deputy

     Re:    United States v. David Laufer
             Criminal No.  TDC-19-593

Dear Counsel:

     This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, David Laufer (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office").  If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below.  If this offer has not been accepted by **September 8, 2020**, it will be deemed withdrawn.  The terms of the Agreement are as follows:

<div align="center">Offense of Conviction</div>

     1.    The Defendant agrees to waive indictment and plead guilty to a one count Information, which will charge the Defendant with Acceptance of Gratuities by a Public Official, in violation of 18 U.S.C. § 201(c)(1)(B).  The Defendant admits that the Defendant is, in fact, guilty of this offense and will so advise the Court.

<div align="center">Elements of the Offense</div>

     2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

> First, that on or about the date set forth in the Information, the Defendant knowingly demanded, sought, received, or accepted, or agreed to receive or accept something of value personally, and that this was not provided by law for the proper discharge of the Defendant's official duty;

> Second, that at that time the Defendant was then a public official; and

<div align="center">1</div>

Third, that the Defendant did so for and because of any official act performed or to be performed by the Defendant.

Penalties

3. The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 201 (c)(1)(B) | N/A | 2 years | 1 year | $250,000 or twice the gain or loss from the offense | $100 |

a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant

authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

  a. If the Defendant had persisted in a plea of not guilty, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

  b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

  c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

  d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

  e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

  f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant

Rev. August 2018

may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

      g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

      h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.      This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

      a.      The parties stipulate and agree that U.S.S.G. § 2C1.2(a)(1) applies to this offense because the Defendant was a public official, resulting in a base offense level of eleven (11). The parties further stipulate and agree that (a) pursuant to U.S.S.G. § 2C1.2(b)(1), the offense level is increased by two levels because it involved more than one gratuity; and (b) pursuant to U.S.S.G. §§ 2C1.2(b)(2) and 2B1.1(b)(1)(B), the offense level is increased by two levels because the value of the gratuities received exceeded $6,500 but was less than $15,000, resulting in an adjusted offense level of **fifteen (15)**.

b.      This Office does not oppose a two-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct.  This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7.      There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.      Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9.      At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a).  The defendant and his counsel must provide the U.S. Attorney's Office with any information that will be used and/or relied upon at sentencing no less than fourteen (14) days prior to sentencing.  This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing.

### Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute, to the extent that such challenges legally can be waived.

   b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742, or otherwise, to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except the Defendant reserves the right to appeal any sentence that exceeds the statutory maximum.

   c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Forfeiture

11. The Defendant understands that the Court will enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture will include assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense, including a sum of money equal to the value of the proceeds of the offense. If specific direct or substitute assets are forfeited and liquidated, any net proceeds of the asset shall be applied to the money judgment.

12. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

13. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such

Rev. August 2018

title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

14. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Restitution

15. The Defendant agrees to the entry of a Restitution Order for the full amount of the actual losses associated with his conviction. The Defendant agrees that, pursuant to 18 U.S.C. § 3663 and 3663A and § 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. If restitution is not paid by the date of sentencing, the Defendant further agrees that the Defendant will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

## Collection of Financial Obligations

16. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court. If restitution is not paid by the date of sentencing, in order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party. If restitution is not paid by the date of sentencing, the Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that any financial statement and disclosures the Defendant submits will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

### Defendant's Conduct Prior to Sentencing and Breach

17. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

18. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure.  A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea.  The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement.

### Court Not a Party

19. The Court is not a party to this Agreement.  The sentence to be imposed is within the sole discretion of the Court.  The Court is not bound by the Sentencing Guidelines stipulation in this Agreement.  The Court will determine the facts relevant to sentencing.  The Court is not required to accept any recommendation or stipulation of the parties.  The Court has the power to impose a sentence up to the maximum penalty allowed by law.  If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement.  Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive.  The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

20. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case.  This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant.  There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement.  No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

Rev. August 2018

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Robert K. Hur
United States Attorney

/s/

Harry M. Gruber
Dana Brusca
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

9-23-20
Date

David Laufer

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

10/1/20
Date

Elizabeth Oyer
Elizabeth Oyer, Esq.

# LAUFER FACTUAL STIPULATION – ATTACHMENT A

The Walter Reed National Military Medical Center ("Walter Reed") provides health services to military families and individuals serving on active duty, individuals returning from war, veterans, and elected officials. The Walter Reed Prosthetics and Orthotics Department provides a full range of prosthetic and orthotic services, including state of the art prosthetic limbs, and nationwide support of wounded warriors. From 2011 to 2019, Walter Reed was located in Bethesda, Maryland.

From in or about 2009 until in or about May 2019, David Laufer ("Defendant" or "Laufer") was a public official and civilian employee of the Department of Defense, who worked as the Chief of the Walter Reed Prosthetics and Orthotics department, and represented it in ordering and purchasing prosthetics and orthotics materials and services.

At all relevant time periods, Person B lived in Montgomery County, Maryland. Person B owned, operated and controlled Company B, which was located in Germantown, Maryland. Person B regularly interacted with Laufer about Company B's business with Walter Reed. From at least in or about 2011 to in or about May 2019, Company B provided prosthetics and orthotics materials to the Prosthetics and Orthotics department in return for payments from the government.

Laufer Caused Walter Reed To Purchase Millions Worth Of Supplies From Company B

From at least in or about 2010 until in or about May 2019, the Walter Reed Prosthetics and Orthotics department used Blanket Purchase Agreements ("BPAs") to order and purchase prosthetics and orthotics materials. BPAs are a simplified government contracting method that allow a government department to obligate funds to purchase materials so that employees can order materials without charging a credit card each time or engaging in a formal contract for each purchase of materials.

Walter Reed awarded Company B multiple BPAs, pursuant to which the Prosthetics and Orthotics department ordered and purchased prosthetics and orthotics materials from Company B. Company B purchased prosthetics and orthotics materials from other manufacturers and distributors, and resold the materials to the Prosthetics and Orthotics department at Walter Reed at a higher price.

Laufer restricted the availability of BPAs to some of the manufacturers and distributors from whom Company B purchased products, thereby inhibiting those companies from doing business directly with Walter Reed, and actively encouraged and directed those companies to sell to Walter Reed through Company B, despite knowing that it would result in a higher price to the government. At the same time that Laufer was causing additional business to be funneled through Company B, Laufer also was restricting the funds available for the BPAs that Walter Reed had issued to manufacturers and distributors of supplies, and increasing the money available to Company B pursuant to its BPA. This had the effect of limiting the vendor options available to Laufer's Department.

The prosthetics and orthotics materials that Company B sold to Walter Reed were often delivered directly from the manufacturers and distributors to Walter Reed. Laufer was personally involved in ordering materials and causing the ordering of materials from Company B pursuant to BPAs. From 2011 to in or about May 2019, the Prosthetics and Orthotics department at Walter Reed and Laufer caused Company B to be paid more than $25 million for prosthetics and orthotics materials. On multiple occasions, Laufer undertook official acts that impacted Company B, including the following:

a) On or about August 5, 2014, Laufer sent an email to the Walter Reed contracting office, writing that "BPA 10-A-0071" to Company B needed to be "renew[ed]" for "575,000."

b) On or about October 8, 2014, Laufer requested and caused to be sent a purchase request document for the 2015 first quarter funding requirements for Company B's BPA at $1,250,000.

c) On or about May 4, 2015, Laufer requested and caused to be sent a purchase request document, and Company B thereafter received a BPA with a funding limit of more than $5 million.

d) On or about September 25, 2015, Laufer requested and caused to be sent a request for more than $1 million of materials from Company B.

Laufer Received Financial Benefits Because Of His Official Position

On multiple dates from 2012 to 2016, other than as provided by law for the proper discharge of official duties, Laufer and his wife received things of value, that is, the airline travel, lodging, and entertainment tickets listed below, as well as direct cash payments, for and because of Laufer's official acts as the Chief of the Prosthetics and Orthotics department and Laufer's official acts in connection with the purchase of prosthetics and orthotics materials from Company B. More specifically, Laufer received the following financial benefits from Person B/Company B:

| Date | Thing of Value Received and Accepted |
|---|---|
| July 2012 | The defendant received and accepted air travel benefits to/from Baltimore, Maryland and Bakersfield, California |
| October 2012 | The defendant received and accepted air travel benefits to/from Washington, D.C. and Boston, Massachusetts |
| November 2013 | The defendant received and accepted lodging benefits in Atlantic City, New Jersey. |
| April 2014 | The defendant received and accepted air travel and car rental benefits in connection with a trip to Port Richey, Florida. |
| September 2014 | The defendant received and accepted air travel benefits between Washington, D.C. and Las Vegas, Nevada |

2

| November 2014 | The defendant received and accepted lodging benefits in Atlantic City, New Jersey. |
|---|---|
| March 2015 | The defendant and his wife received and accepted first class air travel benefits from Washington, D.C. to Las Vegas, Nevada |
| May 2015 | The defendant received and accepted air travel benefits between Washington, D.C. and Tampa, Florida. |
| February 2016 | The defendant received and accepted air travel benefits between Washington, D.C. and Tampa, Florida. |
| March 2016 | The defendant received and accepted four tickets to a hockey game between the Washington Capitals and the Pittsburgh Penguins. |
| May 2016 | The defendant received and accepted air travel benefits from Washington, D.C. to Tampa, Florida, first class air travel benefits to Washington, D.C. from Tampa, Florida. |

Laufer's False Statements

Pursuant to his federal job, Laufer received annual training on government ethics, which warned him about:

    a)     the dangers of accepting financial benefits from a prohibited source, *i.e.* a person or organization seeking to do business with the Department of Defense;

    b)     the federal conflict of interest statutes, and the prohibition on a federal government employee working on a matter affecting certain financial interests; and

    c)     Laufer's financial reporting obligations, including the type of information that Laufer had to disclose on his government ethics filings and Laufer's obligations to be truthful in those filings.

Laufer's government job required him to complete annual Confidential Financial Disclosure forms, OGE Form 450 and OGE Form 450-A. Laufer submitted an OGE Form 450 in 2013, 2016, and 2017, and an OGE Form 450-A in 2014 and 2015. Laufer's OGE filings from 2014-2019 failed to disclose the financial benefits listed above that he received, including but not limited to the cash, airlines travel, sporting event tickets, and lodging that was paid for by Company B and Person B.

In October 2016, federal agents interviewed Laufer as part of an ongoing public corruption probe at Walter Reed, and asked him multiple questions focused on Person B and Company B. Laufer responded by falsely telling agents that (a) he did not recall any occasions when he engaged in travel with Person B; (b) he had never received money, gifts, or sporting

3

event tickets from any vendor doing business before the Prosthetics and Orthotics department; and (c) "Nobody is getting paid off, nobody is getting anything extra."

In March 2017, agents interviewed Laufer in connection with the execution of a search warrant at his residence. The agents asked Laufer about benefits he received from Person B/Company B, and specifically asked him about unexplained cash deposits. Laufer falsely told agents that he earned about $12,000-$13,000 per year in cash from the purchase and sale of bicycles and small collectibles at swap meets, when he then and there knew it was not true.

In September 2019, agents asked Laufer additional questions about the unexplained cash deposits into his bank accounts. Laufer falsely told agents that from 2013 to 2015, he earned $10,000-$12,000 in cash doing work for Person C and Company C, and deposited the cash in his bank accounts, when Laufer then and there knew that Laufer had not obtained any income or cash from Person C and Company C during this time period. As a result of Laufer's false statements, federal agents engaged in significant and unnecessary additional criminal investigation—only to eventually uncover that Laufer had been not been truthful with them.

In December 2019, agents questioned Laufer further about unexplained cash deposits to his bank accounts. Agents characterized the unexplained cash as significantly more than the cash Laufer had falsely told them came from Person C. Laufer then claimed that the unexplained cash, which Laufer estimated at more than $100,000 over many years, came from a moonshine operation.

In or about January 2020, Laufer falsely told federal agents that the unexplained cash, which he estimated was about $10,000-$12,000 per year over many years, was from moonshine and liquor sales when Laufer then and there knew that was not true.

I have reviewed the factual and advisory guidelines stipulation with my attorney, and I do not wish to change any part of it. I understand it, and I voluntarily agree to it. I am completely satisfied with the representation of my attorney. The facts set forth in this Factual Stipulation are true.

_____                    _____
Date                                                    David Laufer

4

event tickets from any vendor doing business before the Prosthetics and Orthotics department; and (c) "Nobody is getting paid off, nobody is getting anything extra."

In March 2017, agents interviewed Laufer in connection with the execution of a search warrant at his residence. The agents asked Laufer about benefits he received from Person B/Company B, and specifically asked him about unexplained cash deposits. Laufer falsely told agents that he earned about $12,000-$13,000 per year in cash from the purchase and sale of bicycles and small collectibles at swap meets, when he then and there knew it was not true.

In September 2019, agents asked Laufer additional questions about the unexplained cash deposits into his bank accounts. Laufer falsely told agents that from 2013 to 2015, he earned $10,000-$12,000 in cash doing work for Person C and Company C, and deposited the cash in his bank accounts, when Laufer then and there knew that Laufer had not obtained any income or cash from Person C and Company C during this time period. As a result of Laufer's false statements, federal agents engaged in significant and unnecessary additional criminal investigation—only to eventually uncover that Laufer had been not been truthful with

In December 2019, agents questioned Laufer further about unexplained cash in his bank accounts. Agents characterized the unexplained cash as significantly more than the cash Laufer had falsely told them came from Person C. Laufer then claimed that the unexplained cash, which Laufer estimated at more than $100,000 over many years, came from a moonshine operation.

In or about January 2020, Laufer falsely told federal agents that the unexplained cash, which he estimated was about $10,000-$12,000 per year over many years, was from moonshine and liquor sales when Laufer then and there knew that was not true.

I have reviewed the factual and advisory guidelines stipulation with my attorney, and I do not wish to change any part of it. I understand it, and I voluntarily agree to it. I am completely satisfied with the representation of my attorney. The facts set forth in this Factual Stipulation are true.

9-23-20
_____
Date

_____
David Laufer

4